May it please the court. This is a case about prosecutors purposefully concealing evidence that an eyewitness saw the victim being threatened by another man an hour after they argued to jurors that Mr. Juniper had already killed her. There's no question that this information was in the possession of the prosecutors. There's no question that it was concealed despite numerous requests by Mr. Juniper's counsel that they turn over Brady information and specific demands for the information that's issue in this appeal. Isn't the issue really this is the case about whether that evidence is prejudicial. Yes sir. This is all it is isn't it. Yes sir. Everybody agrees at least the judge. When you look at the district court the basis for getting to that point whether this evidence was exculpatory and whether it was an alternate type is basically settled but we just need to discuss primarily whether this is prejudicial to the point that we should recognize this Brady violation. Absolutely. The only question before this court is materiality. What makes it prejudicial? This is a pretty overwhelming evidence but I guess efficiency does not is not the determination. Is that right? That's correct. It's not a sufficiency of the evidence test. It's a question of materiality. It's a question of do we have confidence in these verdicts? And I think in order to assess that you need to look at the information that was concealed and the implications of it and then look what remains of the inculpating evidence and that's what I would suggest that we do unless you prefer I do it in a different order. So let's start first off with the evidence. The Jones summary as we've called it is a summary of an interview done with Mr. Roberts and Ms. Roberts on the day. She indicates in that interview that she saw the victim arguing with a man between 9.30 and 10 that morning. She saw the victim arguing with that same man between 12.30 and 12.45 at which time she heard him threaten him. That is the time of the first 911 call. So an eyewitness has seen the victim alive at the same time that at trial the prosecutors already argued to the jurors that she had already been killed. That is the information that was concealed from Mr. Juniper's counsel. And then when she was shown a six-pack, she passed over Mr. Juniper's photograph and picked another man. Well, you know, I would concede, I suppose, I don't know if the government would, that if that's all the government had, that's a pretty strong argument as to materiality. But that's not all the government had in terms of the strength of the evidence. No, that's correct. The district court found three pieces of evidence in particular persuasive and inculpating. One of them was the first 911 call because he found that it was completely unbelievable that this nine, how he didn't know how to reconcile the 911 call with the shots heard later on in the afternoon at 1.30 p.m. by multiple witnesses. And I think the best way to look and to negate that call is to look at what happened in response to that call. You'll recall that Officer Atkinson showed up. He first went up to Shanti Hodges' apartment, which was the other upstairs apartment. She came down and said, I haven't been here. Let me take you to my mother-in-law's apartment, which is Ms. Frazier's apartment. It is the apartment directly below Keisha Stevens' apartment. Officer Atkinson goes in that apartment and talks to Ms. Frazier. Now what we know from the event chronology is that she tells him she's been home all morning and she hasn't heard anything unusual. She hasn't heard any gunshots. She also tells him the lady there left a while ago. And that's in the event chronology. That's information that was not disclosed to trial that counsel did not know about. It says the lady there left a while ago. Now when the second officers come later on and they find the body, one of the things they note is that the TV in the apartment is blaring so loud that it's well above the listening level that they can't think and somebody eventually turns it off. Officer Atkins is in the apartment directly below that apartment at a time when these murders are supposed to have already occurred and he hears nothing, which means that somebody was alive in that apartment in between the time of the first response and the second response to the 911 call. At also turn, the other piece of information that the district court found troubling was the cigarette butt that had Mr. Juniper's DNA on it. He notes that it's found on top of a shard of the door. If you'll look at the photographs that were introduced at trial, you'll see that it's atop one layer, so it's not atop multiple piles. And it's unclear when it gets there. The first responders who actually go into the apartment, the officers who respond to the second 911 call, state in their testimony that they don't look down. One of them testifies. The other is unidentified. He says, I don't look down. At that point in time, he's concerned there is a hostage situation in the apartment or possibly a shooter in the apartment. He's very focused on securing that apartment. He doesn't notice the cigarette butt until he's leaving the apartment. That means that either those officers could have kicked that cigarette butt up from the outside, it could have got stuck in the, you know, the tread on their shoes, or it could have been the person who actually kicked in the door, which we condemn was not Mr. Juniper and that it just got kicked in at that point in time. You don't have any evidence of that, you're just speculating, aren't you? We are speculating on that point, but the point is that we don't have to, with materiality assessment, we don't have to negate every bit of inculcating evidence against Mr. Juniper. What about, I mean, what about the DNA evidence on the knife, and even more importantly, the witnesses who say that they saw him there in the apartment and that he actually confessed to one of them? And these were not strangers. They knew Mr. Juniper, right? That's correct. You're referring... What are we to make of that? You're referring to Rene Rashid, Keon Murray, and Tyrone Mings. The district court found that you can, when presented with the Roberts account, and I would also add Kevin Waterman's account. You'll recall that Kevin Waterman is the witness who lives across the street from Keisha Stevens. He reports to officers that he hears gunshots at 1 27 p.m. that afternoon, correlates with the Roberts family. You cannot take those statements and believe that, and credit them, and also credit the statements of Ming, Murray, and Rashid. Both cannot be true, and one of the reasons we know that is because the prosecution is definitive that this is over by 1 10 p.m., which is the time that there is a call from Rene Rashid's house to Ms. Rogers' house, which means that according to the prosecution's case at trial, they have retrieved Mr. Juniper from the apartment. She has dropped everybody off, and she has gone home. This is 27, 20 minutes before other disinterested neutral witnesses hear these gunshots in the afternoon. These things both cannot be true, and the point is, is the question of who is telling the truth is for the jurors. It was not for the prosecutors to decide behind closed doors. That was the question for the jurors. But is the timeline the real sine qua non of resolving who killed those four persons? The timeline is incredibly important, and we maintain that the concealed evidence puts these... All right, okay, you say it's incredibly important. What time was it when the police officers first got there? These are things we know. What time was it? The first officers responded? Yeah, yeah. The first officers responded to the call at 12 49. 12 49? Yes. Yeah, and you're saying because they responded at that time, they didn't find anything. They did not. Right? So that doesn't put you anywhere in terms of the murders occurring or not occurring, correct? We argue that the murder... Is that right? No. If they didn't find anything, that does not put you anywhere in terms of establishing when the murders occurred, does it? Our condition isn't that they found nothing. It's that there was nothing there to find, but yes. Yes. They found nothing. They found nothing to be found. There was nothing. All right, so I think they mean they found nothing. So it doesn't establish when it happened, correct? Our contention is it established that it had not yet happened because of these... How do you know that? Because they found nothing, it means that it had not happened? Because they spoke to a witness in the apartment below who had not heard gunshots. This was an apartment where there's supposed to have been 10 or 11 gunshots fired, including two small children. It's unbelievable that the woman... So you've argued that it had to have happened already. No, it had not. No, I'm saying it had not yet happened because the witness in the apartment directly below had not heard anything. Okay, so then on that theory, you're going to put the time of the murders is when that witness who you said had to have heard it. So when did that witness hear? Unfortunately, that witness has passed away. That person is dead? That person is dead. That person was dead by the time we got to State Habeas. So you don't know what that person would have said, what the timeline was? We don't know. And we don't know if the police spoke to her again because they've never turned over a statement from her. So you don't know what was suppressed of anything? There's a lot of evidence, yeah, that we believe is still outstanding. You don't know what she said as the time it happened. You don't know what was suppressed. We don't know what was suppressed late on the afternoon. We know that it... Okay, so what's the timeline? And you said it clearly puts this case and the time makes the difference. What's your time that we know that it happened? It's when the police officers came the second time and they found them dead, correct? That's correct. And what time was that? They arrived at the second apartment at 2.37 p.m. So what you have is that we know they were dead at 2.37 p.m. Yes. Now tell me again why, because the Roberts, we know that Juniper couldn't have done that. The Robertses saw, Ms. Roberts, Ms. Wendy Roberts saw Keisha Stevens alive and being She saw them or she heard her argue? She saw them. She saw them. She saw them. From her angle, she could see the stairway? She saw them. How close were they to the door? She doesn't say where she is in the Jones summary, which is where this information is coming from. She doesn't say where she was standing. She says that she sees them arguing. It seems like they're arguing in the parking lot is what I'm understanding from the Jones summary. So she sees them then. That's the time that the first 911 call is being made. So at that point in time, we have an eyewitness who sees her alive. What time? What time again? Between 12.30 and 12.45 and the first 911 call is made at 12.44. The officer shows up, as I mentioned, he doesn't hear the blaring television, which is found when the second response for the officers come. Later on that afternoon, according to the Jones summary, Ms. Roberts says that she hears a series of three or four pops at about 1.30. Kevin Waterman, who is a witness who lives across the street, again, unconnected to any of this, says that he's coming home from work. He looks at the clock in his car. It says 1.27 p.m. He gets out and on the way to his walk into his apartment, he hears three shots and then a pause and then a fourth gunshot. That's when we contend these murders happen. Okay. And Jennifer couldn't have been there. That's correct. All the prosecution's witnesses, for two reasons, all the prosecution's witnesses and the prosecutors committed themselves to this at trial that all of this was done and completed by 1.10 p.m. Because that was the time that Renee Rashid was back at her home and called Ms. Rogers and her testimony was that she didn't go back home again until they had retrieved Mr. Juniper from the apartment and she had dropped off Juniper, Jones and Murray. And how do we know that that's the precise time? Because they obtained the phone records. And introduced them at trial. The prosecutors did. Let me get you back to the question I asked earlier about the DNA evidence on the knife. What's your best argument as to why? Because that's pretty damning evidence, I think. Our evidence, I mean, our argument on that is that, again, this is an apartment that Mr. Juniper was in quite a bit. He helped take care of these kids. It's a knife. The position of the thumbprint on the knife is not consistent with somebody stabbing. It is consistent with somebody holding the knife and putting it away in the drawer. And was there evidence of that? Are you testifying or is that evidence in the record? The evidence of the position of the knife was entered into evidence. The fingerprint examiner has drawn sort of a red arch. And we included that in our briefs of the direction of the fingerprint. So you can see in which way that it's being held. But that's your argument as to why it's impractical or impossible to stab somebody in that? Well, and the evidence about the shape of the wound is not that there is a thumb, like that there's a fingerprint going to the wound. The evidence is that it's sort of a slight triangle with the blunt side, the top of the knife, the non-serrated side sort of creating a mini part of the triangle. And then the serrated side comes down to a point. There's no evidence that there was any finger that went into the spot. And essentially, we would have to disbelieve the other witness who said that your client confessed to the murders? There were two witnesses. And both of those have since recanted and explained why they testified falsely. Tell me about the lead investigator in this case who was later convicted of taking bribes. Yes. How that affects your argument? Well, that's how this evidence first came to light. When Investigator Ford was on trial for federal corruption charges, one of the cases that he ran his scheme in was Mr. Juniper's case. He said that a drug defendant had, was a confidential informant in this case and had given information.  He had given four different pieces of evidence. As a part of the prosecutor's case against Mr. Ford, they introduced the invest, part of the investigation notes from Mr. Juniper's trial. In those investigation notes is where we first found the mention of Ms. Roberts. There was noted that she gave, there was a note that she gave an interview that was consistent with what she had said to detectives earlier. And there was a note that she'd been shown a six pack and picked up the lower left. That was, that came to light after we had filed the state habeas petition, I think three or four years prior. So the statute of limitations in state court had long passed at that point in time. That's when it first came to light. Based on that information, that's how we then tracked down Ms. Roberts, learned of the existence of her son and obtained the affidavits. At that point in time, we requested the state court give us discovery. We, the petition had been denied, but our petition pre-hearing was still pending and the court denied it. So by the time we got to federal court, this was the very first time we'd been able to raise this claim. And then of course we got discovery in federal court. I would note also that we asked for an evidentiary hearing. And the reason that the district court denied us an evidentiary hearing is he found that we had not satisfied 2254 E2B. And that was the incorrect standard, because that standard only applies when somebody has failed to develop the claim in state court. Failed within the meaning of Michael Williams. Mr. Juniper didn't fail to develop this. The reason it wasn't developed in state court is because this evidence was concealed until after his state habeas petition was due. Till long after. At the very least, Mr. Juniper deserves the opportunity to fully develop this claim with full discovery and an evidentiary hearing. With that discovery, at least the evidentiary hearing that you request, would that give you an opportunity to discover or to ask about other aspects of the investigation? Do you think that's important? We filed a... After this information was disclosed, we filed a discovery motion that requested multiple things. We had questions about some of the stuff that had come up here. And we also know that there are statements out there of witnesses that we know gave favorable statements to the police that have never been given to us that would support an alternative timeline, which we contend is the correct timeline. So your theory would be that Juniper wasn't there at all that day? No, he was there in the morning. But when he left, everybody was fine. When he left, everybody was fine? Yes. When somebody else came in and killed four people? Yes, that is our contention. And would you also... Your defense would be that there was no altercation between him and the victim that morning? There was none. Everybody was fine when he left. And there's an affidavit in the record from Michael Lasseter, which is going back to, I'm sorry, somebody's earlier question about how we know that Mr. Juniper couldn't have been there. He also had an alibi beginning at shortly before 12 going on. That's from Michael Lasseter. And Michael Lasseter says that he came over that day and Mr. Juniper... When they found out later on what had happened, Mr. Juniper told him that everybody was fine when he left. I see I've run into my rebuttal. Can I ask you one other question? Yes, sir. There have been a lot of briefs filed on this case and perhaps I've forgotten it, but did you actually press the argument that you just raised a minute ago about the evidentiary hearing in your briefs? We did not. So why haven't you waived it? We did say that we needed an evidentiary hearing. We did not contend that the district court in our briefs had used the wrong standard, but we did press for the fact that this case needs full development and discovery in an evidentiary hearing. All right.  Thank you, Your Honor. I'm going to please the Court. Matthew Dogan, Attorney General's Office, on behalf of the Respondent. The Respondent's intention is that the district court's analysis on the materiality question is thorough and correct. The evidence he found, and he indulged a series of assumptions on behalf of Mr. Juniper before he made the finding, he assumed that the Jones summary was an accurate recital of Mr. Roberts' statements. He assumed, because Mr. Juniper argued primarily from the affidavit, that anywhere the affidavit and the Jones summary differed, he gave the credit to the later in time, more removed affidavit, and still correctly found that there was no materiality from this. The principal reason is, as alluded in the earlier argument, the evidence can't gainsay the forensic evidence that was found at the scene, or the physical evidence that was found at the scene. It was unanalyzed. What it seems to be is, even though we don't get into a sufficiency, is when you use the word evidence cannot gainsay the DNA evidence and the other evidence there, it really kind of puts us in a situation where we're trying to stay away from sufficiency. And determine if this meets the standards by which we will allow this, we will consider that this evidence is so significant that it is material and could bring about a different result. Why, first, why would it not at least give the defendant an opportunity that did not exist without this evidence to present an other suspect defense? He couldn't do that. He had nothing to do that without this evidence. Well, and I don't believe, and I take the district court's opinion, it did not believe this does present an other suspect argument. Picking and choosing was between the Roberts report and the... Without this evidence, what did he have to credibly get up and say that there was another suspect? There was no credible evidence that he had another suspect, and our position is there is now no credible evidence there's another suspect. Giving full credit to whichever pieces of the two Roberts statements are most in Juniper's favor, the most we have is she, in one case, heard but didn't see it, in the other case, did see a woman, the district court assumes it was Tisha Stevens, but notes in a footnote that hasn't been identified, arguing with a man who by build is possibly not Mr. Juniper. But there's no evidence suggesting this other man, if it was Tisha Stevens and it wasn't Juniper, there's no evidence suggesting he entered the apartment, he was not found at the apartment, there's no evidence tying another man to the apartment, there's no evidence identifying who this other person arguing with Tisha Stevens was. Taking it at full blush, if there's evidence that someone else argued with Tisha Stevens at some point, that doesn't identify a different suspect in the murder of her or her brother and her children. What we do know is that- But it does suggest that the timeline that the government proposed at trial was not correct. Well, the government didn't propose a tight timeline in trial. In fact, some state media says that you guys committed yourself to a 110 time of death, if I remember her statement correctly. Is that right? I think even her statement was simply that the prosecution's argument at trial was that everything was done by 110, but not that it happened at 110 or 105 or 1030. And the state habeas court found that there was no timeline established at trial. And if I understand, you said that the argument was that it happened before 110, right? Well, her statement was 110. I don't recall the time of the phone call, but yes. Didn't you just say the prosecution argued that everything was over at 110? Did I hear you incorrectly? Was I misinformed? Or I was not clear. That was her statement. I don't- Well, she said. Okay. Well, what was the prosecution's timeline that they tied it to? And I don't recall the time of the phone call. You should know the record counsel now. I should know that. And I know that they argued that by the time of that phone call, it was done. You didn't know the time would be of the essence in this oral argument today? It's our position the time was not at the essence of trial, Judge. No, I didn't say at trial. I said today. You didn't think the Brady issue was going- Suppressed in a timeline that would be relevant today? Because I was wondering how you don't know whether the prosecution at trial decided was the ultimate time that everything was done. I thought you said 110, but now you said you don't know. What was their theory? Because that's important for us to look at materiality of this witness. What did you argue? Clearly was the time where these murders clearly had to have been completed. Yes, Your Honor, and I didn't- You don't know? I don't have it on- OK, well, move on. You're not prepared. You're not prepared. And I apologize. I did review the timeline. I don't have it handy on the page I'm looking at. OK, go ahead.  Was that correct, that the call made from his mother's home to the victim? Do you agree with that? Counsel said that, that 110? That by that time, Mr. Jenifer had been found and driven away from the apartment by the time of that call, yes. So then the 127 report by Ms. Roberts, that's inconsistent, correct? Her report that there were later gunshots? Yeah. That's inconsistent with those gunshots being, if they were gunshots, there was some testimony that they were a noise that sounded like hiccups or pops or something else. But assuming they were gunshots, that would be after the time. So it's hard to get around it. It certainly throws in question the prosecution's theory of the timeline of the murders, correct? Yeah, it is helpful or exculpatory to use the term of art. Yeah. And the district court found that it was exculpatory. But what we believe the district court found correctly in its next step was that it wasn't material. It's not material. Because of the overwhelming objective evidence like DNA. Yes, sir. But he lived there, right? He stayed there frequently. I don't think he was living there at the time, but he was there frequently. Yeah, OK. So his DNA would probably be around, wouldn't you think? His DNA would be around. But the door was bursted in, according to Renee Rasheed's testimony, as she was leaving. When Juniper was still, she thought behind him and then returned to the courtroom. I thought she didn't look back. She didn't look back, but she heard the crash of something being kicked in. OK. And the only thing we know that was kicked in in that vicinity was the front door. And the cigarette butt was found in the front door, as counsel has explained, that that was not the focus of the officer's investigation as they tried to secure the scene that they thought might still be dangerous. But they did secure the scene. They argued at trial that the cigarette butt might have been cooked up by the officers, and the jury didn't take that. For that matter, they argued at trial that the- But their defense didn't say that he wasn't there that day, did they? Their defense wasn't that he wasn't there, was it? That day? That day? No. Do we know the basis of which, why this evidence just wasn't turned over to the extent that the prosecutor knew about this evidence, or do we only know that this lead investigator who's been convicted of taking bribes in drug cases was the only one who just withheld this evidence? Do we know any of that? We don't know what decision was made about what was included in the disclosures pre-trial. I mean, wouldn't it be helpful to understand at least the Why didn't you turn over this evidence? Because you wouldn't be standing in front of us arguing this if you just turned over this evidence that you now say it wouldn't have changed the result. I mean, if it doesn't change the result, clearly, why not just tell the other side and make sure you don't have this problem? But don't you think it would be helpful for at least- And not to cast any aspersions on anybody in the process, not the prosecutors or anyone else. But we just don't know. What we do know is this is some pretty serious information that a witness has indicated could be helpful to a defendant in preparing for trial. Whether he'd prevail or not is another question. And the choice is made not to give it to him. But all we know is we've got a, for want of a better term, a criminal, criminally convicted lead investigator who didn't turn it over. But we don't know who else knew about it. We don't know why. Wouldn't that be helpful to know? We know that the information was, at minimum, in the police custody, so it's chargeable to the prosecutor. We know it was in their possession for purposes of Why wouldn't you turn it over? Why wouldn't they turn it over? Not that you can answer that. If you do know. But you do agree it should have been turned over. Everybody agrees on that. I agree. I wouldn't be here today if it had been turned over. But as Stricker points out, it's not a Brady vote. I'm not going to take that further. Not just you wouldn't be here today if it hadn't. We all agree on that. But do you agree it should have been turned over? I think we argue. What was clear? District court was clear that it would have been better practice to turn it over. And certainly you disagree with that. No, but the question is whether it was constitutional violation not to turn it over. And as Strickler points out, so you think if you have evidence before you as a prosecutor in a case, we're not even on appeal. Lead investigator brings this evidence. You think it's not unconstitutional to not give that evidence to the other side because you make the assessment I have evidence that even if it comes up later, it will show it's not material or prejudicial. Well, Kyle's in fact, puts the burden on the prosecutor to weigh the evidence. I don't want to be argumentative with you, but I want to make sure I believe I did. Is that what you think? What I just said? Yes. No. Is that the best practice of prosecutors? No. OK, I understand. Not the best process. Let me say that again. You say that a prosecutor, I want to make sure we inform the practice at the prosecutorial level when these cases come up. I'm trying to determine how do we avoid this. But if the mindset of the prosecutor is, yes, there's some evidence out there that the other side absolutely has that could help the defense. But from our perspective, even if it later comes up as a Brady violation, it's not material. You think that's just best practice? If that's the entire analysis of turning over the evidence or not, no, I don't condone that standard. I'm using these facts, not the entire. Use these facts. If the prosecutor in this case knew this evidence that is in this case, not if, in this case, and made a conscious decision not to give it, only believe that if it's ultimately appealed, it would be determined not to be material. You think that's OK? I think a prosecutor is obliged to make materiality judgments. Kyle says that. And I'm going to accept that you just said to me, yes. Unless you tell me no. I think we're using terms here that are not always the same. And I want to be clear that I'm not trying to slide. I think this is a simple question. It seems to me that you could answer this very simply. I'm not trying to box you in one way or the other on this. But what I'm trying to determine is, what is the mindset of the prosecutor in the case for evidence like this? And we don't know at this point. But we could have an evidentiary hearing to determine. And it would be important to me if I knew that the prosecutor consciously made a decision, not the lead investigator. I'm not going to even give it to the defendant. Because even if it comes up later on in an appeal to Brady, the court will say it's not material. If the prosecutor's professional judgment is it's not material. This evidence in this case, I'm not talking about if. If you see this evidence as ultimately not being material based upon this and that the prosecutor in this case could have said, even if he did say it, still it's not material. I think that's a constitutional choice by a prosecutor. If he judges it not material, not to disclose it. Thank you. In a case like this, someone following up a little bit sort of theme, at least, if not directly, Judge Wynn's inquiry, in a capital case, when you look at Brady, even though we're looking in the lens of guilt or innocence, correct, in terms of whether or not it would be probability of a different outcome, correct? Yes. Right. But don't we also really have to look at it in the sense, too, of sentencing? A lot of times, the difference between having done defense work for years while I was on the bench, even though it's guilt, if you can get a question of whether or not are you certain that he did. For example, if you have time, which we don't know since you don't know what your timeline was at the trial, but if you have that and you have a witness that knows clearly that somebody around 127 must have done this, don't you have the sense when you're a defense lawyer, you say, wait a minute, are you going to kill this man? Are you certain that it was... Because that theory would have been who is the... It would be the empty chair. They would have to do it. Who was that person? We know it wasn't Juniper who walked across that lot. We know it couldn't have been because it's somebody at 127. And that may be enough to keep them saying the difference between life and death. Don't we, in that context, do you agree with that? I agree that materiality can relate both to guilt and independently to punishment. I don't think there was any argument offered below or on brief that this was material to punishment in this case. Wow. I mean, that's all they would really have. Wouldn't it be circumstance in a sense? Because you said you'd have that powerful DNA type stuff. You'd have the people who said he said this, but they would say that an independent person says the timeline is wrong and that there is somebody else out there who we don't know who he is. And you said that could not be the difference in terms of whether they say death or life in prison without parole. I'm just wondering in terms of... Because we're speculating because I don't think Judge Wayne got a clear answer as to... And rather troubling response in the sense that I know you have to weigh what's relevant, but in a death case, you would say somebody... You have a witness that you don't turn over that clearly contradicts your theory of timeline and you could make a materiality and say, well, I think there's enough DNA evidence here. I don't think that's material. So we're going to suppress that. Do you really think that's a proper inquiry or decision for a prosecution to make, particularly in a death case? I... Kyle does go on to say in a close case that a prosecutor should err on the side of disclosure, but it does put that burden on the prosecutor's shoulders to make that threshold determination materiality. Okay. Is there any dispute but that this evidence, which identifies an alternate perpetrator, has been considered by many courts to be core Brady material? You do agree that is core Brady material? As opposed to impeachment evidence or... There are just a number of courts out there that have held that. You don't disagree with that, do you? That the Roberts State... If you do, let me know the cases you're talking about. That evidence showing, identifying a witness as an alternate... A witness who identifies an alternate perpetrator is core Brady material. Okay. That statement I don't disagree with. I disagree that the Roberts... The Jones summary identifies an alternate suspect. Well, you know you'd have to look at her statement in order to come to that conclusion, and maybe there's a dispute on it, but didn't the court not hold an evidentiary hearing and basically take it to be as true? And her statement was she saw another man, not fitting Juniper's build, or heard in the other statement, arguing with someone we assume to be Keisha. There's no evidence placing another man breaking down the door, picking up the knife, stabbing Keisha, or shooting the other victims. There's nothing... Another man arguing with him, with her, with Keisha? Does she place... What is her statement? Tell me her statement because I'm confused. I thought it was much more than just she heard somebody upstairs, and that was the end of it. Well, the statements vary between the affidavit and the police notes. In the affidavit, she didn't see the arguing. She saw someone leaving, but didn't describe him. In the police notes, she saw the argument and gave a physical description, although she picked someone out from the photo array that didn't fit that physical description. But she didn't pick the defendant. No, but the photo array... That's the significant part about it. Photo array. But she didn't fail to pick him because of the physical build. She described someone 150 pounds. Everyone in the photo array had a build similar to Juniper's 300 pounds. May I ask a question about the witnesses who the government said Juniper confessed to? Your opponent says that they subsequently recanted. And my question is, so what are we to make of that? Is that evidence still relevant, or is it heavily discounted as a result of the recantation? It is not. The question of the statements, the basis of the statements came out as a Brady claim in state habeas. It was argued that Murray had been threatened by the police, and that's the reason he testified as he did at trial. The state Supreme Court found he was not threatened. Smith, the state Supreme Court found prosecutors had not made any promises to deal with him. Those are findings of fact in the state habeas. The basis for the recantation has been found to be untrue. The recantations themselves are entitled to no particular weight. I see my time has expired. No other questions? I'd ask the judge to be affirmed. Thank you, counsel. I wanted to clear up the timeline question a little bit for you. We contend that there are two times that you can depend on that are reliable in this case, that you can know what the prosecution's timeline was at trial. The first is the time of the first 911 call, which was placed at 1244, and we know that because of the event chronology from the 911 dispatcher. The significance of that is that the prosecution's evidence at trial was that Mr. Mings, who they contend it was his girlfriend who made this call, had already seen Mr. Juniper, Mr. Jones, Mr. Murray, and Ms. Rashid leave that apartment, which means that all of this had to be done, the murders had to have been committed before 1244 p.m. when that call was made. The 110 p.m. is the time that Rashid arrived back at her own home and placed the call from her home to Ms. Rogers' house. So the prosecution's timeline fixes these murders at trial before 1244 p.m., and there's no dispute about that. So the prosecution vouchsafed for the correctness of the 1244 call and content of it? Yes. I also want to go back to the question of the standard and remind the court here, as you have noted, Judge Wynn, that we didn't get an evidentiary hearing in the district court, and we also didn't get full discovery, as we've noted. This was before the district court on a motion to dismiss. He was supposed to take all of our allegations and credit them as true, and part of that, as he found, was that this evidence discredited Murray, Mings, and Rashid, the people who put Juniper at that apartment that morning and partaking in these crimes or seeing him in the aftermath. If we view Ms. Roberts' statement holistically or however, does it show, would it show for the defendant or a defense that would allow him to bring a defense of an alternate perpetrator? Absolutely, and not just an alternate perpetrator. To me, I'm understanding. Yes, sir. The other side say, no, it doesn't show an alternate perpetrator. You tell me where this statement says alternate perpetrator. Tell me how does it do that? How does it do that? What this does is this puts a neutral, disinterested witness who is not getting a deal. I'm talking about Ms. Roberts. She doesn't get a deal. She has no drug background. She has not given inconsistent statements to officers. On the day of these homicides, she tells the detectives that she saw Keisha Stevens, who she identifies as the woman who just moved in with young children, there's nobody else in that building who fits that description, arguing and being threatened by a man at 1230, between 1230 and 1245. That's a time when the prosecution contends these murders had already happened. In fact, the substance of the 911 call, that first one, said that the gunshot was an hour before. She says she sees Keisha Stevens alive. That's the evidence. And then later on, they, and they talk to the people in the apartment below. They haven't heard any gunshots. They haven't heard any unusual noises at that point in time. Nothing has happened. There's no blaring TV upstairs. Then later that afternoon, her, her son, and another disinterested witness who has no criminal background, who has not given multiple inconsistent statements to the police, who has not received a deal, hear gunshots between 127 and 130 in the afternoon. The correlation in the time of those things alone is significant. She's, she says 130. He says 127 p.m. So you got a photo array? Get a photo array. Does it, does it show the bill of them? It's just the face up. And that's, that's in the record. It's attached to Prosecutor Evans's affidavit. The people that picked out the defendant only saw the face up? They didn't see the bill? Nobody picked out the defendant from the six pack. The only person that we know that was shown a six pack was Ms. Roberts. And she picked out somebody else. And I also want to note the fact that there was a lot of question about why was this not turned over. The District Court found that this was the Commonwealth's entrenched resistance to transparency, not just at trial, but in post-conviction proceedings. There were multiple representations made by the Attorney General's office that everything had been turned over, that Brady had been completely complied with. That was in the state habeas, and that was in federal habeas as well. Maybe you can answer my question. If this evidence shows an alternate perpetrator, is that core Brady material? Absolutely. If this isn't Brady material, I don't know what is Brady material. Is the determination of materiality something for a prosecutor to make a determination as to whether to exclude Brady material in the first instance at trial to say, well, it's not material and therefore I will not give it to you because on appeal it will be found to be not material? No. And if this court upholds the District Court's decision, they're going to wave around this case as a shield not to turn over this kind of stuff. When is the determination of materiality made? Is it made at the trial or is it made on appeal? How does that work? Materiality isn't made until after the fact, until after there's been a concealment of favorable or exculpatory information. That's when it's made. Thank you so much. Thank you very much. We'll come down, re-counsel and proceed to our next case.
judges: Roger L. Gregory, James A. Wynn Jr., Albert Diaz